**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Robert Pasqual SERRAVO, Respondent.**

**No. 90SC322.**

Supreme Court of Colorado, En Banc.

Jan. 13, 1992.

Robert R. Gallagher, Jr., Dist. Atty., Eighteenth Judicial Dist., James C. Sell, Chief Deputy Dist. Atty., Englewood, for petitioner.

Fogel, Keating & Wagner, P.C., Steven R. Polidori, Betty Ann Bass, for respondent.

Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *People v. Serravo*, 797 P.2d 782 (Colo.App.1990), in order to determine the meaning of the phrase "incapable of distinguishing right from wrong" in Colorado's statutory definition of insanity codified at section 16–8–101(1), 8A C.R.S. (1986). The trial court, in the insanity phase of a criminal prosecution, instructed the jury that the phrase "incapable of distinguishing right from wrong" refers to a person who appreciates that his conduct is criminal but, due to a mental disease or defect, believes that the conduct is morally right. The prosecution, pursuant to section 16–12–102(1), 8A C.R.S. (1986), appealed the trial court's ruling on

the question of law, and the court of appeals approved the ruling.[1] The court of appeals held that the meaning of "incapable of distinguishing right from wrong" is not confined to a defendant's knowledge of legal right or legal wrong but rather refers to a defendant's cognitive inability to distinguish right from wrong under societal standards of morality, and that the trial court's instruction did not inject a subjective standard of morality into the test of legal insanity. *Id.* at 783. The court of appeals also held that a deific-decree delusion is an exception to the societal standard of moral wrong and that, under such an exception, a defendant may be adjudicated insane if the defendant knew that the act was illegal and morally wrong under societal standards of morality but, due to a mental disease or defect, believed that God had ordained the act.

Although we disagree with the court of appeals' conclusion that the trial court's instruction did not incorporate a subjective standard of morality into the right-wrong test for legal insanity, we affirm that part of the court of appeals' decision which holds that the phrase "incapable of distinguishing right from wrong" refers to a cognitive inability to distinguish right from wrong under existing societal standards of morality rather than, as implied by the trial court's instruction, under a purely subjective and personal standard of morality. In addition, rather than characterizing the deific-decree delusion as an exception to the right-wrong test for legal insanity, we hold that a defendant may be judged legally insane where, as here, the defendant's cognitive ability to distinguish right from wrong with respect to an act charged as a crime has been destroyed as a result of a psychotic delusion that God has ordered him to commit the act. Finally, we hold that federal and state principles of double jeopardy prohibit the retrial of the defendant on the issue of his sanity or insanity at the time of the commission of the acts charged against him.

## I.

Serravo was charged in a multi-count information with crimes of attempt to commit first degree murder after deliberation,[2] assault in the first degree,[3] and the commission of crimes of violence.[4] The charges arose out of the stabbing of his wife, Joyce Serravo, on May 10, 1987. After the charges were filed, Serravo entered a plea of not guilty by reason of insanity and was thereafter examined by several psychiatrists. The issue of legal insanity was tried to a jury, which returned a verdict of not guilty by reason of insanity.[5]

The evidence at the insanity trial established that the stabbing occurred under the following circumstances. On the evening of May 9, 1987, Serravo, who was a King Soopers union employee, visited striking employees at the King Soopers store near his home. Serravo returned home at approximately 12:30 a.m. on May 10. After sitting in the kitchen and reading the Bible, he went upstairs to the bedroom where his wife was sleeping, stood over her for a few minutes, and then stabbed her in the back just below the shoulder blade. When his wife awoke, Serravo told her that she had been stabbed by an intruder and that she should stay in bed while he went downstairs to call for medical help.

Police officers were later dispatched to the home. Serravo told the officers that he had gone to the King Soopers store and had left the garage door open, that the door leading to the house from the garage was unlocked, that when he returned from King Soopers and was reading the Bible he heard his front door slam, and that he went upstairs to check on his wife and children and saw that his wife was bleeding from a

---

1. Section 16–12–102(1), 8A C.R.S. (1986), authorizes the prosecution to appeal any decision in a criminal case upon any question of law.

2. §§ 18–2–101(1) & 18–3–102(1)(a), 8B C.R.S. (1986).

3. § 18–3–202(1)(a), 8B C.R.S. (1986).

4. § 16–11–309, 8A C.R.S. (1986).

5. Section 16–8–104, 8A C.R.S. (1986), states that the issues raised by an insanity plea shall be tried "separately to different juries, and the sanity of the defendant shall be tried first."

wound in her back. Serravo signed a consent to search his home and gave the police clothes that he was wearing at the time of his discovery of his wife's injury.

Several weeks after the stabbing Serravo's wife found letters written by Serravo. In these letters Serravo admitted the stabbing, stating that "[o]ur marriage was severed on Mother's Day when I put the knife in your back," that "I have gone to be with Jehovah in heaven for three and one-half days," and that "I must return for there is still a great deal of work to be done." After reading the letters, Serravo's wife telephoned him in order to confront him about the letters. Serravo told his wife that God had told him to stab her in order to sever the marriage bond. Mrs. Serravo informed the police of these facts and Serravo was thereafter arrested and charged.

The prosecution presented expert psychiatric testimony on Serravo's sanity at the time of the stabbing. Doctor Ann Seig, a resident psychiatrist in training at the University of Colorado Health Sciences Center, examined Serravo pursuant to a court ordered evaluation of his mental state. Serravo gave the doctor a history of having worked on a plan, inspired by his relationship to God, to establish a multi-million dollar sports complex called Purely Professionals. This facility, according to Serravo, would enable him to achieve his goal of teaching people the path to perfection. On the night of the stabbing, Serravo, according to the history given to Doctor Seig, was excited because he finally believed that he had received some positive encouragement in his endeavor from some King Soopers union members, but he was discouraged by some inner "evil spirits" who kept raising troublesome questions about how he would deal with his wife's lack of encouragement and support. Doctor Seig diagnosed Serravo as suffering either from an organic delusional disorder related to left temporal lobe damage as a result of an automobile accident some years ago or paranoid schizophrenia.[6] Either diagnosis, in Doctor Seig's opinion, would adequately account for Serravo's delusional belief that he had a privileged relationship with God as the result of which he was in direct communication with God. Doctor Seig testified that Serravo was operating under this delusional system when he stabbed his wife and these delusions caused him to believe that his act was morally justified. Doctor Seig, however, was of the view that Serravo, because he was aware that the act of stabbing was contrary to law, was sane at the time of the stabbing.

Serravo presented four psychiatrists and a clinical psychologist on the issue of his legal insanity. The first psychiatrist, Doctor Frederick Miller, was of the opinion that on the night of the stabbing Serravo was under the psychotic delusion that it was his divine mission to kill his wife and that he was morally justified in stabbing her because God had told him to do so. Doctor Miller was not quite certain whether Serravo's psychotic disorder was paranoid schizophrenia, a paranoid delusional disorder, or an organic delusional disorder. Although uncertain of the exact diagnostic label applicable to Serravo, Doctor Miller was of the opinion that Serravo's mental illness made it impossible for him to distinguish right from wrong even though Serravo was probably aware that such conduct was legally wrong.

Another psychiatrist, Doctor Eric Kaplan, was the attending psychiatrist at the University of Colorado Health Services and a member of the faculty of the medical school. Doctor Kaplan supervised Doctor Ann Seig during her examination of Serravo and also made an independent evalua-

---

**6.** A standard mental health diagnostic manual published by the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Third Edition Revised (1987) (DSM IIIR), defines paranoid schizophrenia as a "major disturbance in the content of thought involv[ing] delusions that are often multiple, fragmented or bizarre...." *Id.* at 188. A preoccupation with grandiose or religious delusions is a symptom of paranoid schizophrenia. *Id.* The DSM IIIR defines a delusional disorder as the presence of a persistent thematic delusion. A person laboring under a grandiose delusion is convinced that he or she has a great talent or insight, or has a special relationship with a prominent person or deity. *Id.* at 199–200.

tion of Serravo's mental condition. It was Doctor Kaplan's opinion that Serravo was suffering from paranoid schizophrenia at the time of the stabbing and was laboring under the paranoid delusion that his wife stood in the way of his divine mission of completing the large sports complex, that Serravo believed that the stabbing was the right thing to do, and that Serravo, as a result of his mental illness, was unable to distinguish right from wrong with respect to the stabbing. Two other psychiatrists, Doctor Geoffrey Heron and Doctor Seymour Sundell, offered the opinion that Serravo, at the time of the stabbing, was suffering from paranoid schizophrenia and a paranoid delusion about God which so affected his cognitive ability as to render him incapable of distinguishing right from wrong as normal people would be able to do in accordance with societal standards of morality.

Doctor Leslie Cohen, a clinical psychologist, also testified about Serravo's mental condition at the time of the stabbing. Having conducted extensive psychological testing of Serravo, Doctor Cohen was able to offer an opinion on Serravo's reality testing, his emotional reactivity, and his volition, all of which were relevant to the functioning of his conscience. The doctor was of the opinion that Serravo's conscience was based on a false belief or delusion about his magical powers as a result of his direct communication with God. Serravo, in the doctor's view, was suffering from a psychotic disorder that rendered him incapable of distinguishing right from wrong at the time of the stabbing. Although Doctor Cohen acknowledged that Serravo appeared to cover up his conduct when the police arrived at his home, the doctor explained that conduct as the product of a small part of his still intact reality testing. According to Doctor Cohen, Serravo is "not an incoherent man who can't figure out what's going on," but rather "senses that people don't understand his reasoning very well" and thus apparently believed that the police "wouldn't understand the complex reasoning that went behind the stabbing and that it would be better if he kept it to himself."

At the conclusion of the evidence, the trial court instructed the jury, in accordance with the statutory definition of insanity, that a person "is not accountable who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong, with respect to the act." The court also gave the following jury instruction, to which the prosecution objected, on the meaning of the phrase "incapable of distinguishing right from wrong":

### Instruction No. 5

As used in the context of the statutory definition of insanity as a criminal defense, the phrase "incapable of distinguishing right from wrong" includes within its meaning the case where a person appreciates that his conduct is criminal, but, because of a mental disease or defect, believes it to be morally right.

In objecting to the jury instruction, the prosecution stated that it would permit the jury to return an insanity verdict based solely on a purely subjective moral standard rather than a legal standard of right and wrong. The trial court, however, was of the view that, because the statutory definition of insanity was not cast in terms of either legal or moral wrong, it was appropriate to instruct the jury that legal insanity included an incapacity, due to a mental disease or defect, to distinguish right from wrong in a moral sense.

The jury returned a verdict of not guilty by reason of insanity at the time of the commission of the alleged crimes, and the court committed Serravo to the custody of the Department of Institutions until such time as he is found to be eligible for release.[7] The prosecution appealed the dis-

---

7. Section 16–8–105(4), 8A C.R.S. (1986), states:
   If the trier of fact finds the defendant not guilty by reason of insanity, the court shall commit the defendant to the custody of the department of institutions until such time as he is found eligible for release. The executive director of the department of institutions shall designate the state facility at which the defendant shall be held for care and psychiatric treatment and may transfer the defendant

trict court's ruling on the challenged jury instruction to the court of appeals, which approved the ruling. The court of appeals concluded that the statutory definition of insanity "reflects the General Assembly's intent to define wrong under a societal standard of moral wrong" and that, "as society's moral judgment is usually identical to the legal standard, the test is not broadened much if 'wrong' is determined by a societal moral standard." *Serravo*, 797 P.2d at 783. The court of appeals also concluded that the jury instruction did not apply a subjective moral standard to the defendant's capacity to distinguish right from wrong. *Id.* at 782–83. Finally, the court adopted the so-called "deific-decree" exception to the societal standard of moral wrong. Based on that exception, the court of appeals determined that, although there was some evidence indicating that Serravo knew the stabbing of his wife was illegal and contrary to societal standards of morality, there was evidentiary support for the insanity verdict because there was expert testimony that Serravo was inspired by an insane delusion that God had decreed the act. *Id.* at 783. We thereafter granted the People's petition to consider whether the court of appeals correctly interpreted the meaning of the phrase "incapable of distinguishing right from wrong" in the statutory definition of insanity.

## II.

■ We initially consider whether the phrase "incapable of distinguishing right from wrong" should be measured by legal right and wrong, as argued by the People, or instead, should be measured by a societal standard of morality, as determined by the court of appeals. The phrase in question appears in section 16–8–101, 8A C.R.S. (1986), which defines legal insanity as follows:

> The applicable test of insanity shall be, and the jury shall be so instructed: "A person who is so diseased or defective in

mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.

Because Colorado's statutory definition of insanity is based on the right-wrong test of legal insanity articulated in *M'Naghten's Case*, 8 Eng.Rpt. 718 (1843), *see People v. Low*, 732 P.2d 622, 629 n. 9 (Colo.1987), our resolution of the issue before us must begin with a review of that case.

### A.

In 1843 Daniel M'Naghten shot and killed Edward Drummond, the private secretary to Sir Robert Peel. M'Naghten, believing that Peel was heading a conspiracy to kill him, had intended to kill Peel, but instead shot Drummond because he mistakenly believed Drummond to be Peel. M'Naghten claimed at trial that he was insane and could not be held responsible because his delusion caused him to commit the act. The jury was instructed that it was to decide whether M'Naghten "had or had not the use of his understanding, so as to know that he was doing a wrong or wicked act," and that if the jury found that he "was not sensible, at the time he committed it, that he was violating the laws both of God and man," then the jury should return a verdict of not guilty by reason of insanity. 8 Eng.Rpt. at 719–20. The jury found M'Naghten not guilty by reason of insanity, and the House of Lords thereafter debated the proper standard of legal insanity and posed five questions to the judges of the Queen's Bench in an attempt to better formulate the insanity defense.[8] The

---

from one institution to another if in the opinion of the director it is desirable to do so in the interest of proper care, custody, and treatment of the defendant or the protection of the

public or the personnel of the facilities in question.

**8.** The insanity defense is frequently reformulated in response to a public outcry, as in *M'Naghten's Case*, 8 Eng.Rep. 718 (1843), to an insanity

judges' answers to these questions, which were appended to the report of the original case, have come to be considered as if they were the law of the case. *See generally* LaFave & A. Scott, Jr., *Criminal Law* at 274 (1972).

The initial question asked of the judges was the following:

> 1st. What is the law respecting alleged crimes committed by persons afflicted with insane delusion, in respect of one or more particular subjects or persons: as, for instance, where at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit?

8 Eng.Rpt. at 720. The judges answered that a person under the influence of an insane delusion who believes that the act will redress or revenge a supposed grievance will "nevertheless [be] punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law; by which expression we understand Your Lordships to mean the law of the land." *Id.* at 722.

The next two questions asked of the judges were answered as one question, and the answer qualifies the reference to "the law of the land" in the first answer. The second and third questions asked in *M'Naghten* were as follows:

> 2d. What are the proper questions to be submitted to the jury, when a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons, is charged with the commission of a crime (murder, for example), and insanity is set up as a defence?

3d. In what terms ought the question be left to the jury, as to the prisoner's state of mind at the time when the act was committed?

*Id.* at 720. The answer to these questions was as follows:

> [T]he jurors ought to be told in all cases that every man is to be presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proved to their satisfaction; and that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused at the time of doing the act knew the difference between right and wrong: which mode, though rarely, if ever, leading to any mistake with the jury, is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong, in respect to the very act with which he is charged. *If the question were to be put as to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that everyone must be taken conclusively to know it, without proof that he does know it. If the*

---

verdict in the prosecution of a defendant for an act of violence against a public figure. Several commentators have noted the similarity between the English government's request for a clear definition of insanity following M'Naghten's acquittal and the clarification of the insanity defense for federal crimes contained in the Insanity Defense Reform Act of 1984, 18 U.S.C.A. § 4241 (1986 Supp.), which was passed

following John Hinckley's acquittal by reason of insanity for attempting to assassinate President Ronald Reagan in 1981. *See generally,* Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded In Its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense,* 55 U.Cinn.L.Rev. 943, 944–49 (1987).

*accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable; and the usual course therefore has been to leave the question to the jury, whether the party accused had a sufficient degree of reason to know that he was doing an act that was wrong: and this course we think is correct, accompanied with such observations and explanations as the circumstances of each particular case may require.*

*Id.* at 722–23 (emphasis added).

### B.

The judges' answer to the second and third questions in *M'Naghten* suggests that a person may be considered legally sane as long as the person commits an act contrary to law and knows that the act is morally wrong without regard to the person's actual knowledge of its legality under positive law. Such an interpretation, in our view, is eminently sound.

We acknowledge that some cases subsequent to *M'Naghten* have interpreted the right-wrong test as limiting the insanity defense to a cognitive inability to distinguish legal right from legal wrong, with the result that a person's simple awareness that an act is illegal is a sufficient basis for finding criminal responsibility. *E.g., Regina v. Windle,* 2 Q.B. 826 (1952); *State v. Andrews,* 187 Kan. 458, 357 P.2d 739, *cert. denied,* 368 U.S. 868, 82 S.Ct. 80, 7 L.Ed.2d 65 (1961); *State v. Hamann,* 285 N.W.2d 180 (Iowa 1979); *McElroy v. State,* 146 Tenn. 442, 242 S.W. 883 (1922). We believe, however, that such an analysis injects a formalistic legalism into the insanity equation to the disregard of the psychological underpinnings of legal insanity. A person in an extremely psychotic state, for

example, might be aware that an act is prohibited by law, but due to the overbearing effect of the psychosis may be utterly without the capacity to comprehend that the act is inherently immoral. *See Hamann,* 285 N.W.2d at 189 (Uhlenhopp, J., dissenting). A standard of legal wrong would render such a person legally responsible and subject to imprisonment for the conduct in question notwithstanding the patent injustice of such a disposition. Conversely, a person who, although mentally ill, has the cognitive capacity to distinguish right from wrong and is aware that an act is morally wrong, but does not realize that it is illegal, should nonetheless be held responsible for the act, as ignorance of the law is no excuse. *Id.*

Construing the term "wrong" as moral wrong finds support in several cases which have basically followed the well-reasoned opinion of the New York Court of Appeals in *People v. Schmidt,* 216 N.Y. 324, 110 N.E. 945 (1915). *E.g., State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972); *People v. Skinner,* 39 Cal.3d 765, 217 Cal.Rptr. 685, 704 P.2d 752 (1985); *People v. Wood,* 12 N.Y.2d 69, 236 N.Y.S.2d 44, 187 N.E.2d 116 (1962); *see also United States v. Sullivan,* 544 F.2d 1052, 1055–56 (9th Cir.1976).[9] The *Schmidt* opinion, written by then Judge Benjamin Cardozo, rejected the view that the term "wrong" means "contrary to the law of the state." 110 N.E. at 946. After a careful analysis of *M'Naghten* and the history of the insanity defense, Judge Cardozo remarked:

The [M'Naghten] judges expressly held that a defendant who knew nothing of the law would none the less be responsible if he knew that the act was wrong, by which, therefore, they must have meant, if he knew that it was morally wrong. Whether he would also be re-

---

**9.** One line of cases interpreting the *M'Naghten* test seems to require that the defendant know that the act is wrong under societal standards of morality *and* is also illegal. *E.g., State v. Crenshaw,* 98 Wash.2d 789, 659 P.2d 488, 494 (1983). This conjunctive formulation of the *M'Naghten* test would appear to be unnecessarily rigid and would apparently exonerate a person by reason of insanity when the person knew the act was morally wrong but, as a result of a mental

disease or defect, was not aware that the act was contrary to law. At least one court has held that the *M'Naghten* test requires a person to be able to distinguish moral *or* legal right from moral *or* legal wrong. *E.g., State v. Thorne,* 239 S.C. 164, 121 S.E.2d 623 (1961), rev'd on other grounds, *State v. Torrence,* 406 S.E.2d 315, 328 n. 5 (S.C.1991). Such a disjunctive formulation of the test is inherently ambiguous and can only foster uncertainty in application.

sponsible if he knew that it was against the law, but did not know it to be morally wrong, is a question that was not considered. In most cases, of course, knowledge that an act is illegal will justify the inference of knowledge that it is wrong. But none the less it is the knowledge of wrong, conceived of as moral wrong, that seems to have been established by that decision as the controlling test. That must certainly have been the test under the older law when the capacity to distinguish between right and wrong imported a capacity to distinguish between good and evil as abstract qualities.[10] There is nothing to justify the belief that the words right and wrong, when they became limited by [M']Naughten's Case to the right and wrong of the particular act, cast off their meaning as terms of morals, and became terms of pure legality.

110 N.E. at 947 (brackets added).

In resolving the ostensible tension between the legal standard of wrong in the answer to the first *M'Naghten* question (i.e., a person is legally responsible if the person acted with knowledge that an act is contrary to the "law of the land") and the moral standard suggested in the answer to the second and third *M'Naghten* questions (i.e., actual knowledge of codified law is not required for a conviction, but rather a person may be punished for conduct if the person knows that the act is one that "he ought not do"), the *Schmidt* opinion stated that the first answer "presupposes the offender's capacity to understand that violation of the law is wrong" and that the offender is sane except for a delusion that his act will redress a supposed grievance or

attain some public benefit. 110 N.E. at 948. The first *M'Naghten* answer, in other words, "applies only to persons who 'are not in other respects insane.'" *Id.* The delusion that an act will redress a supposed grievance or result in a public benefit, in Cardozo's words, "has no such effect in obscuring moral distinctions as a delusion that God himself has issued a command," inasmuch as "[t]he one delusion is consistent with knowledge that the act is a moral wrong, [but] the other is not." *Id.*

Because the delusion emanating from an imagined grievance or public benefit does not obscure moral distinctions—as would an insane belief that God has issued a command—there is really no conflict between "the commands of law and morals" in a case where a defendant knows that the act is morally wrong but commits the act because he believes that either personal or public good will result. *Id.* There is an obvious difference in kind, however, between that case and the person who suffers from an insane delusion that virtually destroys the cognitive ability to distinguish the morality or immorality of an act, even though the person may be aware the act is contrary to law. Although in most instances the very same forms of criminal conduct classified as felonies would also be considered violative of basic ethical norms, we are of the view that limiting the definition of "wrong" to "legal wrong" results in stripping legal insanity of a significant part of its psychological components. Various forms of mental diseases or defects can impair a person's cognitive ability to distinguish moral right from moral wrong and yet have no effect whatever on the per-

---

10. In the early nineteenth century, prior to *M'Naghten*, English law treated the phrase "good and evil," which connotes the moral quality of an act, as synonymous and interchangeable with the phrase "right and wrong."

The first known substitution of "right and wrong" for "good and evil" was in *Parker's Case* (1812), in which the Attorney–General argued that "before it could have any weight in rebutting a charge [treason] so clearly made out, the jury must be perfectly satisfied, that at the time when the crime was committed, the person did not really know right from wrong." In *Bellingham's Case* (1812), both phrases were used, and Lord Chief Justice

Mansfield instructed the jury that "the single question was, whether, at the time this fact [murder] was committed, [the defendant] . . . possessed a sufficient degree of understanding to distinguish good from evil, right from wrong." In the United States, these two phrases were also used synonymously in both infancy and insanity cases.

Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey,* 54 Calif.L.Rev. 1227, 1237 (1966) (footnotes omitted and brackets in original).

son's rather sterile awareness that a certain act is contrary to law. To be sure, a person should not be judged legally insane merely because that person has personal views of right or wrong at variance with those which find expression in the law. It is quite another matter, however, to say that a mentally ill person suffering from an insane delusion that overbears the mental capacity to distinguish right from wrong should nonetheless be held criminally responsible for conduct solely because the person was aware that the act charged in the criminal prosecution was contrary to law. Such a result, in our view, proceeds from a narrowly legalistic interpretation that accords little weight to the baneful effects of various forms of mental illness on the cognitive capacity of the human mind.

In urging that the phrase "incapable of distinguishing right from wrong" in section 16–8–101, 8A C.R.S. (1986), should be limited to legal right and wrong, the People focus on that part of the insanity definition which states that "care should be taken not to confuse such mental disease or defect with moral obliquity" and argue that this statutory language manifests a legislative intent to define legal insanity in terms of an incapacity to distinguish legal right from legal wrong. We acknowledge, as asserted by the People, that the term "moral obliquity" refers to a deviation from moral rectitude. *Webster's Third New International Dictionary* 1557 (1986). Accepting that definition, however, does not lead us to the construction urged by the People.

The purpose served by the statutory reference to "moral obliquity" is not to provide a definitional component for legal insanity, which has been defined in the preceding sentence of section 16–8–101 as an incapacity to distinguish right from wrong with respect to the act due to a mental disease or defect existing at the time of the commission of the act. Rather, the purpose served by the reference to "moral obliquity" is to distinguish, on the one hand, an act committed by a person capable of distinguishing right from wrong but nonetheless acting out of a perverse and culpable rejection of prevailing moral standards and, on the other hand, an act committed by a person in a state of mental illness that renders the person incapable of distinguishing right from wrong with respect to the act. In the case of a person acting out of moral obliquity, rather than a mental disease or defect rendering the actor incapable of distinguishing right from wrong, the person is accountable to the law. *See Battalino v. People,* 118 Colo. 587, 595–96, 199 P.2d 897, 902 (1948). In our view, therefore, the statutory definition of legal insanity in terms of an incapacity to distinguish *right* from *wrong* due to a mental disease or defect, along with the statutory distinction between an act resulting from legal insanity and an act resulting from *moral* obliquity, serves to confirm the fact that the General Assembly intended the concepts of right and wrong to be measured by a moral rather than a legal standard. If the General Assembly intended otherwise, we reasonably may assume that it would have cast the statutory definition of insanity in terms of an incapacity to distinguish "legality from illegality" or "lawfulness from unlawfulness" rather than in terms of an incapacity to distinguish "right from wrong" with respect to the act charged as a crime. We thus conclude that the term "wrong" in the statutory definition of insanity refers to moral wrong.

### C.

Moral wrong can be measured either by a purely personal and subjective standard of morality or by a societal and presumably more objective standard. We believe that the better reasoned interpretation of "wrong" in the term "incapable of distinguishing right from wrong" refers to a wrongful act measured by societal standards of morality.

The concepts of "right" and "wrong" are essentially ethical in character and have their primary source in the existing societal standards of morality, as distinguished from the written law. A person's awareness and appreciation of right and wrong derive primarily from a variety of experi-

ences and relationships including, but not necessarily limited to, behavioral rules endorsed by the social culture as well as ethical principles transmitted through the family, the community, the formal educational process, and religious associations. Simply put, legal insanity combines concepts of law, morality and medicine with the moral concepts derived primarily from the total underlying conceptions of ethics shared by the community at large. *See United States v. Brawner,* 471 F.2d 969, 976, 982 (D.C.Cir.1972). Defining "wrong" in terms of a purely personal and subjective standard of morality ignores a substantial part of the moral culture on which our societal norms of behavior are based.[11]

Construing the term "wrong" in accordance with societal standards of morality results in a substantially more objective standard of moral wrong than the purely personal and subjective moral standard, under which an accused could be adjudicated insane even if he knew that the act in question was both forbidden by law and condemned by society, but nonetheless harbored a personal belief that the act was right. A personal and subjective standard of morality should not be permitted to exonerate a defendant any more than an ignorance of the law, engendered by a mental illness, should be equated with legal insanity. In sum, the appropriate construction of the term "incapable of distinguishing right from wrong with respect to [the] act" in section 16–8–101 should be measured by existing societal standards of morality rather than by a defendant's personal and subjective understanding of the legality or illegality of the act in question. *See generally Corley,* 108 Ariz. at 243, 495 P.2d at 473; *Skinner,* 217 Cal.Rptr. at 695, 704 P.2d at 762; *Moses v. State,* 263 S.E.2d 916,

918 (Ga.1980); *People v. Wood,* 187 N.E.2d at 121.

### D.

■ We turn then to Jury Instruction No. 5, which stated that the phrase "incapable of distinguishing right from wrong" includes the case of a person who "appreciates that his conduct is criminal but, because of a mental disease or defect, believes it to be morally right." Although the court of appeals concluded that this instruction did not incorporate a "subjective moral standard to the determination of whether defendant understood right from wrong," *Serravo,* 797 P.2d at 782–83, we are of a contrary view. Jury Instruction No. 5 was cast in terms so general that it well could have been interpreted by the jury to incorporate a personal and subjective standard of moral wrong rather than a societal standard of right and wrong. The court of appeals' approval of the instruction, in our view, is inconsistent with its adoption of a societal standard of moral wrong for purposes of legal insanity.

We emphasize here that in most cases involving the defense of legal insanity there will be no practical difference between a definition of "wrong" in terms of legal wrong and a definition of "wrong" in terms of societal standards of morality. This is so because, for the most part, the proscriptions of the criminal law generally reflect the moral prohibitions of the social order. As previously discussed, however, the concept of legal insanity, while part of our positive law, incorporates psychological and moral components that are not necessarily limited by the confines of positive law. A clarifying instruction on the definition of legal insanity, therefore, should clearly state that, as related to the conduct

---

**11.** The traditional reluctance to hold children under a certain age responsible for criminal acts is a good illustration of the fact that moral standards are learned through a dynamic societal process. Society has determined that both insane persons and children under a certain age are not responsible moral agents, in the former case because a mental disease or defect has prevented an adequate assimilation of societal moral standards, and in the latter case because immaturity has prevented an adequate opportu-

nity for acquiring a moral sense of right and wrong. Like the *M'Naghten* test, the test for measuring infant incapacity has generally involved the inquiry of whether the child could distinguish between right and wrong. *See generally,* Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States: An Historical Survey,* 54 Calif.L.Rev. 1227, 1237–47 (1966).

charged as a crime, the phrase "incapable of distinguishing right from wrong" refers to a person's cognitive inability, due to a mental disease or defect, to distinguish right from wrong as measured by a societal standard of morality, even though the person may be aware that the conduct in question is criminal. Any such instruction should also expressly inform the jury that the phrase "incapable of distinguishing right from wrong" does not refer to a purely personal and subjective standard of morality.

### III.

We next consider the relationship between the so-called "deific-decree" delusion and Colorado's test of legal insanity. The court of appeals, after holding that the term "wrong" in the statutory definition of insanity refers not to legal wrong but moral wrong under societal standards of morality, held that the "deific-decree" delusion was an exception to the societal standards of moral wrong. Drawing on the opinion of the Washington Supreme Court in *State v. Crenshaw*, 98 Wash.2d 789, 659 P.2d 488 (1983),[12] the court of appeals limited the so-called deific-decree exception to those situations "in which a person commits a criminal act, knowing it is illegal and morally wrong according to society's standards but, because of a mental defect, believes that God has decreed the act." *Serravo*, 797 P.2d at 783. This exception, the court of appeals went on to conclude, must be distinguished from the case "in which a person acts in accordance with a duty imposed by a particular faith." *Id.* In our view, the "deific-decree" delusion is not so much an exception to the right-wrong test measured by the existing societal standards of morality

as it is an integral factor in assessing a person's cognitive ability to distinguish right from wrong with respect to the act charged as a crime.

In discussing the deific-decree delusion in *Schmidt*, the court stated:

We must not ... exaggerate the rigor of the rule by giving the word "wrong" a strained interpretation, at war with its broad and primary meaning, and least of all, if in so doing, we rob the rule of all relation to the mental health and true capacity of the criminal. The interpretation placed upon the statute by the trial judge may be tested by its consequences. A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the rule, or in its reason and purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent....

....

... Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be

---

12. In *Crenshaw*, the Supreme Court of Washington carved out the deific exception from Justice Cardozo's reference in *Schmidt*, 110 N.E. at 949, to a mother insanely obeying God's command to kill her child. The *Crenshaw* court, citing *Schmidt*, stated that although the woman who kills her infant child under an insane delusion that God has ordered the act might know "that the law and society condemn the act, it would be unrealistic to hold her responsible for the crime, since her free will has been subsumed by her belief in the deific decree." 659 P.2d at 494.

*Crenshaw* appears to have judicially embroidered the *Schmidt* opinion, since *Schmidt* contains no reference to the volitional or free will aspect of the insanity defense. On the contrary, Judge Cardozo in *Schmidt* specifically states that New York's test of insanity does not contain an irresistible impulse component. 110 N.E. at 949. It thus appears that the *Crenshaw* court added a volitional component to the "deific-decree" exception which is not supported by *Schmidt*.

said of the offender that he knows the act to be wrong.

110 N.E. at 949. If a person insanely believes that "he has a command from the Almighty to kill, it is difficult to understand how such a man can know that it is wrong for him to do it." *Schmidt*, 110 N.E. at 948 (quoting *Guiteau's Case*, 10 Fed. 161, 182 (1882)). A person acting under such a delusion is no less insane even though the person might know that murder is prohibited by positive law. *Schmidt*, 110 N.E. at 948. It thus seems clear to us that a person is legally insane if that person's cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God has commanded the act.[13] We thus conclude that, although the court of appeals mischaracterized the deific-decree delusion as an exception to the right-wrong test for legal insanity, a defendant nonetheless may be judged legally insane where, as here, the defendant's cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God has decreed the act.

## IV.

■ The question remains whether, in light of our disapproval of the trial court's jury instruction on the meaning of "wrong" in Colorado's test of legal insanity, we should remand the case for a new trial on the issue of insanity. This case was filed in the court of appeals as a prosecutorial appeal pursuant to section 16–12–102(1), 8A C.R.S. (1986), on a question of law—namely, the correctness of the jury instruction on the meaning of the term "wrong" in the statutory definition of insanity. Although we disagree with the court of appeals' conclusion that the challenged jury instruction

did not apply a subjective standard of morality to the right-wrong test for legal insanity, we conclude that a retrial of the defendant would violate the federal and state constitutional prohibitions against placing an accused twice in jeopardy for the same offense. U.S. Const. amend. V; Colo. Const. art. II, § 18.

In Colorado, while the issue of an accused's sanity must be tried separately from the issue of guilt, § 16–8–104, 8A C.R.S. (1986), insanity remains an affirmative defense to a crime. §§ 18–1–802 & 18–1–805, 8B C.R.S. (1986). Once any credible evidence of this affirmative defense is introduced into evidence, the prosecution bears the burden of proving the defendant's sanity beyond a reasonable doubt. §§ 16–8–105(2), 8A C.R.S. (1986) & 18–1–407, 8B C.R.S. (1986). In *People ex rel. Juhan v. District Court*, 165 Colo. 253, 265, 439 P.2d 741, 747 (1968), this court held that "[m]ental capacity to commit a crime is a material part of total guilt for there can be no crime without the *mens rea*." A jury verdict of not guilty by reason of insanity, therefore, is an adjudication on the merits which absolves the defendant of criminal responsibility, *Coolbroth v. District Court*, 766 P.2d 670, 672 (Colo.1988), and results in a commitment of the defendant to the custody of the Department of Institutions until such time as the defendant is eligible for release, § 16–8–105(4), 8A C.R.S. (1986).

In *People v. King*, 181 Colo. 439, 444, 510 P.2d 333, 336 (1973), this court reversed the trial court's direction of an insanity verdict and held that a retrial of the defendant would not violate the Double Jeopardy Clauses of the federal and state constitutions. *King* is no longer good law under the double jeopardy principles formulated by the United States Supreme Court in

---

**13.** We recognize, as did the court in *People v. Schmidt*, 216 N.Y. 324, 110 N.E. 945, 950 (1915), that some defendants may attempt to hide behind "a professed belief that their crime was ordained by God." The *Schmidt* court, however, went on to observe that "[w]e can safely leave such fabrications to the common sense of juries." *Id.; see also State v. Crenshaw*, 98 Wash.2d 789, 659 P.2d 488, 494 (1983) (jury properly found that defendant's adherence to

the Muscovite faith which requires husbands to kill unfaithful wives was a personal subjective belief rather than a "deific decree"). We agree with the *Schmidt* court's observation. The jury, functioning as the conscience of the community, is well-suited to the task of determining whether a defendant in a given case had the mental capacity to distinguish right from wrong in accordance with societal standards of morality with respect to an act charged as a crime.

*Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Burks,* the defendant was charged with robbing a federally insured bank and raised the insanity defense. In a non-bifurcated trial, the jury rejected the insanity defense and returned a guilty verdict. The trial court thereafter denied the defendant's motion for a new trial. The Sixth Circuit Court of Appeals reversed the defendant's conviction on the ground that the government had failed to prove the defendant's sanity beyond a reasonable doubt, but remanded the case to the district court "for a determination of whether a directed verdict of acquittal should be entered or a new trial ordered." 437 U.S. at 4, 98 S.Ct. at 2143. The Supreme Court granted certiorari to resolve whether an accused may be subjected to a second trial when his conviction in a prior trial was reversed by an appellate court solely for lack of sufficient evidence to sustain the jury's verdict on the issue of the defendant's sanity. In holding that the Double Jeopardy Clause prohibited a retrial, the Supreme Court stated:

> Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.
>
> \*   \*   \*   \*   \*   \*
>
> Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only "just" remedy available for that court is the direction of a judgment of acquittal. To the extent that our prior decisions suggest that by moving for a new trial, a defendant waives his right to a judgment of acquittal on the basis of evidentiary insufficiency, those cases are overruled.

437 U.S. at 16, 18, 98 S.Ct. at 2149, 2150 (emphasis in original).

Because *Burks* holds that an appellate determination of evidentiary insufficiency to sustain a verdict is an adjudication on the merits that bars retrial, it necessarily follows that the Double Jeopardy Clause of the United States Constitution prohibits retrial after a jury verdict of not guilty by reason of insanity. Such a verdict represents a judicial determination that, irrespective of any error in a trial court's instructional rulings, the prosecution has failed to prove the defendant's sanity beyond a reasonable doubt and that, consequently, the defendant lacked the mental capacity to commit the crime charged against him. *See United States v. Scott,* 437 U.S. 82, 97–98, 98 S.Ct. 2187, 2197–98, 57 L.Ed.2d 65 (1978) (noting that, for purposes of Double Jeopardy Clause, post-jeopardy dismissal based on insufficiency of prosecution's evidence relating to insanity defense, as distinguished from post-jeopardy dismissal based on preindictment delay, constitutes a finding of lack of criminal liability even though such finding results from erroneous evidentiary ruling or erroneous interpretation of governing legal principles). Allowing a retrial on the issue of a defendant's sanity after the jury has returned a verdict of not guilty by reason of insanity is nothing less than giving the state the impermissible "second bite at the apple." *Burks,* 437 U.S. at 17, 98 S.Ct. at 2149.

Furthermore, we have interpreted the Double Jeopardy Clause of the Colorado Constitution more expansively than the United States Supreme Court's construction of its federal counterpart. Under Colorado case law, a judgment of acquittal after the attachment of jeopardy precludes a retrial of the defendant even though the judgment was improper and was based on grounds unrelated to factual guilt. In *People v. Paulsen,* 198 Colo. 458, 601 P.2d 634 (1979), for example, we disapproved the trial court's erroneous entry of a judgment of acquittal on grounds unrelated to factual guilt but nonetheless held that "[r]etrial is precluded even when the trial court erred as a matter of law in granting the judgment of acquittal." 198 Colo. at 460, 601 P.2d at 636. We subsequently elaborated on *Paulsen* in *People v. Quintana,* 634 P.2d 413, 420 (Colo.1981), where we stated:

> *Paulsen* makes clear that the precise character of the trial court's judgment—

whether an improper judgment of dismissal on grounds unrelated to factual guilt or innocence or an acquittal based on an erroneous application of evidentiary standards—is not determinative of the retrial bar under the Colorado Double Jeopardy Clause. Nor is the court's characterization of its action as a dismissal, a directed verdict, or an acquittal significant to the double jeopardy issue. *See, e.g., Krutka v. Spinuzzi* [153 Colo. 115, 384 P.2d 928 (1963)]; *Menton v. Johns,* [151 Colo. 276, 377 P.2d 104 (1962)]; *Castner v. People,* 67 Colo. 327, 184 P. 387 (1919); *Roland v. People,* 23 Colo. 283, 47 P. 269 (1896). A retrial on a criminal accusation is prohibited whenever the first trial results in a final judgment favorable to the defendant. To permit a retrial under such circumstances would expose the defendant to that very same risk of repeated prosecutions which the Double Jeopardy Clause was designed to prevent.

Where, as here, a trial court dismisses a criminal charge after jeopardy has attached, Colorado constitutional doctrine prohibits the state from subjecting a defendant to a retrial involving the resolution of factual issues underlying the criminal accusations, notwithstanding the trial court's erroneous interpretation or application of substantive law in terminating the proceedings in the defendant's favor.

634 P.2d at 420 (footnotes omitted).

Section 16–12–102(1), 8A C.R.S. (1986), which permits the prosecution to appeal a trial court's decision on a question of law, expressly provides that "[n]othing in this section shall authorize placing the defendant in jeopardy a second time for the same offense." In light of the fact that the defendant was placed in jeopardy when he was adjudicated not guilty by reason of insanity, we limit appellate relief in this case as follows: we disapprove the trial court's jury instruction which defined the phrase "incapable of distinguishing right from wrong" in such a general manner as likely to be interpreted by a jury as including a purely subjective and personal standard of morality; we approve of the court

of appeals' construction of the phrase "incapable of distinguishing right from wrong" as referring to an incapacity, due to a mental disease or defect, to know that an act is wrong under existing societal standards of morality; and we disapprove of the court of appeals' characterization of the deific-decree delusion as an exception to the right-wrong test for legal insanity rather than as an integral factor in assessing a person's cognitive ability to distinguish right from wrong with respect to the act charged as a crime. The judgment of the court of appeals is accordingly approved in part and disapproved in part.

VOLLACK, J., dissents.

Justice VOLLACK dissenting:

The majority holds that the phrase, "incapable of distinguishing right from wrong," means a mental incapacity to know that an act is wrong under existing societal standards of morality. In addition, the majority rejects the characterization of the deific decree as an exception to the right-from-wrong test and holds that a defendant may be judged legally insane when the defendant's cognitive ability to distinguish right from wrong with respect to an act has been destroyed as a result of a psychotic delusion that God has ordered the act. Finally, the majority holds that federal and state principles of double jeopardy prohibit the retrial of the defendant on the issue of his sanity at the time of the commission of the act charged against him. Maj op. at 130. I disagree with the majority's holdings in this case.

## I.

The issue raised in this case is the meaning of the phrase, "incapable of distinguishing right from wrong," in section 16–8–101(1), 8A C.R.S. (1986). In determining the meaning of "incapable of distinguishing right from wrong," this court must look first and foremost to the language of the statute to determine whether the General Assembly adopted a legal or moral standard for determining criminal insanity when they enacted section 16–8–101(1).

## A.

The origin of criminal insanity tests is *M'Naghten's Case*, 8 Eng.Rep. 718 (1843). In *M'Naghten*, the judges determined that a defendant is not criminally responsible (1) where the defendant does not know the nature and quality of his act, or (2) where he does not know right from wrong with respect to that act. *M'Naghten*, 8 Eng. Rep. at 722; *State v. Boan*, 235 Kan. 800, 686 P.2d 160, 167 (1984); Wayne LaFave & Austin Scott, *Criminal Law* § 4.2, 311 (2d ed. 1986). Since the *M'Naghten* decision in 1843, American courts and legislatures have adopted various tests to determine criminal responsibility. Some courts have adopted the *M'Naghten* test, *see State v. Hamann*, 285 N.W.2d 180 (Iowa 1979); other courts have adopted the American Law Institute Model Penal Code (Official Draft and Revised Comments 1985) [hereinafter cited as "Model Penal Code"] test (the ALI–MPC test),[1] *see Christopher v. State*, 511 N.E.2d 1019 (Ind.1987); while still other courts have adopted modifications of these two tests or completely different tests. *See Durham v. United States*, 214 F.2d 862 (D.C.Cir.1954) (adopting modern "product" test). *But see United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972) (abandoning *Durham* product test and adopting ALI–MPC test).[2]

1. This test states:
    (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the *criminality [wrongfulness]* of his conduct or to conform his conduct to the requirements of law.
    (2) As used in this Article, the terms, "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial behavior.
   American Law Institute Model Penal Code § 4.01 (Official Draft and Revised Comments 1985) (emphasis added).

2. The "product" test stated that a defendant is "not criminally responsible if his unlawful act was the product of a mental disease or mental defect." *Durham v. United States*, 214 F.2d 862, 874–75 (D.C.Cir.1954). The *Brawner* court abandoned the *Durham* product test because the *Durham* rule had the "undesirable characteristic ... of undue dominance by the experts giving testimony." *United States v. Brawner*, 471 F.2d

In Colorado, the test of criminal responsibility, which has been codified in section 16–8–101(1), is the "right from wrong" prong of the test announced in *M'Naghten*, 8 Eng.Rep. 718 (1843). *People v. Low*, 732 P.2d 622, 629 n. 9 (Colo.1987); *Castro v. People*, 140 Colo. 493, 507, 346 P.2d 1020, 1027 (1959). Section 16–8–101(1) states:

(1) The applicable test of insanity shall be, and the jury shall be so instructed: "A person who is so diseased or defective in mind at the time of the commission of the act as to be *incapable of distinguishing right from wrong with respect to that act* is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.".

(Emphasis added.)

## B.

Next, the language in section 16–8–101(1) must be placed in context with the language from other tests for insanity. Section 16–8–101(1) does not follow the language from the American Law Institute Model Penal Code (ALI–MPC) test.[3] The

969, 981–82 (D.C.Cir.1972). This "dominance by the experts" resulted because there was no generally accepted meaning of the "concept requiring that the crime be the 'product' of the mental disease." *Id.* at 982.

3. There are many insanity tests which have adopted variations of the language enumerated in the ALI–MPC test. *See* ABA Criminal Justice Mental Health Standards § 7–6.1 (1986). Prior to 1984, the federal courts used the ALI–MPC test to define insanity. In 1984, Congress enacted 18 U.S.C. § 17 (1983), which states:
    It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the *wrongfulness* of his acts. Mental disease or defect does not otherwise constitute a defense.
    This section deleted the volitional prong of the ALI–MPC test but retained the "wrongfulness" language.

ALI–MPC test states that a person is not criminally responsible if "he lacks *substantial* capacity … to *appreciate* the *criminality* [*wrongfulness*] of his conduct." Under this test, jurisdictions have the option to adopt either the "wrongfulness" or "criminality" standard.[4] ABA Criminal Justice Mental Health Standards [hereinafter "ABA Mental Health Standards"] § 7–6.1, at 344 (1986). The "wrongfulness" standard was intended by the drafters of the ALI–MPC test to establish a broader, moral criterion for determining criminal responsibility. *See United States v. Segna*, 555 F.2d 226, 232 (9th Cir.1977)[5]; ABA Mental Health Standards § 7–6.1, at 344. Courts that have adopted the ALI–MPC "wrongfulness" language have followed the intent of the ALI–MPC drafters and defined "wrongfulness" as morally wrong. *See United States v. Dubray*, 854 F.2d 1099, 1101 (8th Cir.1988) (stating that the Eighth and Ninth Circuits recognize that "wrongfulness" means moral wrongdoing).

Colorado has not adopted the ALI–MPC "wrongfulness" language.[6] On the contrary, section 16–8–101(1) adopted the "right from wrong" language enumerated in *M'Naghten*. Accordingly, case law defining criminal responsibility based on the "wrongfulness" language is not persuasive, or even applicable, to our determination of the meaning of "incapable of distinguishing right from wrong" in section 16–8–101(1).[7]

C.

The majority fails to define the phrase, "incapable of distinguishing." However, the General Assembly's adoption of this language is important for two reasons. First, because *M'Naghten* focuses on the cognitive capacity of the person, this phrase indicates the level of cognition that is necessary for a person to be determined insane. Second, the General Assembly's use of this phrase indicates the legislature's intent to adopt a rigid test of insanity similar to the original *M'Naghten* test.

The original *M'Naghten* formulation was a rigid standard and required that a person be totally devoid of cognitive ability before they could be found insane. *See Wade v. United States*, 426 F.2d 64 (9th Cir.1970); ABA Mental Health Standards § 7–6.1, at 333, 344. Accordingly, modern tests, such as the ALI–MPC test, the ABA standard, and the federal standard, adopted language such as "unable to appreciate the wrong-

---

**4.** The American Bar Association's Criminal Justice Mental Health Standards state:

Use of the term *criminality* suggests to triers of fact that they ignore even the most florid effects of delusions and hallucinations in any case in which a defendant's conduct would still be criminal had the delusions been true or the hallucinations real. The term *wrongfulness*, which focuses on the extent to which the convictions on the part of actors about their acts were influenced by their mental disorders, is therefore necessary to accommodate adequately the morally significant effects of severe mental illness.

ABA Criminal Justice Mental Health Standards § 7–6.1, at 344 (1986) (footnote omitted) (emphasis in original).

**5.** In *Segna*, the court stated:

It is clear from the ALI debates leading to inclusion of the alternative word *wrongfulness* in the ALI test that the drafters intended that word to mean more than contrary to law. It is less clear, however, whether the drafters intended this expanded term to be measured objectively or subjectively,…. Nevertheless,

the weight of the discussions points toward a preference for the [subjective meaning].

*Segna*, 555 F.2d at 232 n. 6 (citation omitted) (emphasis in original).

**6.** The General Assembly's intent not to include the ALI–MPC language and its meaning in § 16–8–101(1) is further supported by a clear reading of § 16–8–101(2). The language from this § 16–8–101(2) is language adopted from the ALI–MPC test. Section 16–8–101(2) provides: "(2) The term 'diseased or defective in mind', as used in subsection (1) of this section, does not refer to an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Compare supra* note 1. Thus, the General Assembly did consider the ALI–MPC language in enacting § 16–8–101. However, while the General Assembly adopted the ALI–MPC language in subsection (2), it clearly rejected the ALI–MPC "wrongfulness" language in part (1) of the statute in favor of the *M'Naghten* "right from wrong" language.

**7.** Thus, the majority's reliance on *United States v. Brawner*, 471 F.2d 969, 976 (D.C.Cir.1972), is misplaced. *See* maj. op. at 137–138. In *Brawner*, the court abandoned the *Durham* product

fulness" or "lacks substantial capacity to appreciate the wrongfulness." *See* Model Penal Code § 4.01; ABA Mental Health Standards § 7–6.1, at 330, 345 (use of term "appreciate" provides flexibility to "take into account all aspects of a defendant's mental and emotional functioning"); 18 U.S.C. § 17 (1983). These tests discarded the term "know," which was used in *M'Naghten,* in favor of language that provided more flexibility and indicated that the defendant was not required to be totally incapacitated in order to be found criminally insane. *See Wade,* 426 F.2d at 71; ABA Mental Health Standards § 7–6.1, at 333, 343–44.

The General Assembly did not adopt the "unable to appreciate" language. In fact, use of the phrase, "incapable of distinguishing," [8] indicates an intent to adopt a restrictive standard similar to the original interpretation of *M'Naghten* that a defendant must be totally devoid of cognitive capacity to satisfy the test of insanity in section 16–8–101(1). [9] The majority, by not defining the phrase, "incapable of distinguishing," disregards the language in the statute and the intent of the General Assembly.

The phrase, "incapable of distinguishing right from wrong," incorporates the same limited meaning of criminal insanity that the *M'Naghten* judges enumerated. Dur-

test and adopted the ALI–MPC test. *See supra* note 2.

**8.** "Incapable" is defined as "lacking capacity, ability, or qualification for the purpose or end in view; … lacking legal qualification or power especially because of some fundamental legal disqualification." *Webster's New International Dictionary* 1141 (3rd ed. 1969).

**9.** While requiring the defendant to be totally devoid of cognitive capacity may seem harsh, we must remember that the insanity defense is just one part of the statutory scheme of mental-illness defenses in Colorado. Defendants who suffer from mental illnesses, but are not totally devoid of their cognitive capacity, may still have their mental illness considered under the impaired-mental-condition defense. § 18–1–803, 8B C.R.S. (1986).

The majority opinion, however, suggests that something less than total incapacity is sufficient under § 16–8–101(1). Under the majority's theory, a defendant who knows an act is against the law but is not sure of the act's moral consequences may be legally insane. This does not

ing hearings on H.B. 1289, which amended the definition of insanity in 1983, the bill's sponsor stated: "[I]f a person is truly so far gone he cannot tell the difference between right and wrong, … that is what the definition of insanity should be." *Hearings on H.B. 1289 Before the House Judiciary Committee,* 54th Gen. Assembly, 1st Reg. Sess. (Audio Tape 83–8, Feb. 15, 1983, at 2:15 p.m.). Under this limited meaning of criminal insanity, a defendant is not criminally insane if the defendant was "conscious" that the particular act was "contrary to the law of the land." *M'Naghten,* 8 Eng.Rep. at 722–23; *see also Regina v. Windle,* 2 Q.B. 826 (1952) ("right from wrong" means "contrary to law"); *State v. Hamann,* 285 N.W.2d 180 (Iowa 1979) ("right from wrong" refers to "legal right or wrong"). Thus, the focus under *M'Naghten,* and section 16–8–101(1), is whether the defendant is so devoid of cognitive capacity that the defendant's mental status prevented the defendant from being "conscious" that his or her conduct was forbidden by the law.

### D.

The majority concludes, relying on what is essentially *dicta* from a 1915 New York case, *People v. Schmidt,* 216 N.Y. 324, 110 N.E. 945 (1915),[10] that "wrong" means

satisfy the insanity test under *M'Naghten* and § 16–8–101(1) because someone who is conscious that the act they are performing is against the law is not totally devoid of cognitive capacity. Such a defendant, however, may still resort to one of the other mental-illness defenses.

**10.** In *Schmidt,* the defendant was arrested for murder and initially pleaded insanity, claiming that the voice of God commanded him to kill the victim as a sacrifice. The defendant was convicted of murder. After trial, the defendant motioned for a new trial claiming newly discovered evidence. In the motion, the defendant stated that his original story was false. He claimed that he fabricated the insanity claim and conceded that his sanity was correctly decided by the jury. The defendant requested a new trial based on this evidence. After discussing the meaning of "wrong" in the New York statute and concluding that "wrong" meant "morally wrong," the court stated: "It is of no importance now whether the trial judge charged the jury correctly upon the question of insanity, because in the record before us the defendant

whether the defendant knows that an act is wrong by society's morals. The express language of the *M'Naghten* decision, however, supports neither the majority's nor the *Schmidt* opinion, but instead indicates that "right from wrong" was meant to be legal right from wrong.

First, nowhere in any of the *M'Naghten* judges' answers does the word "moral" appear. Secondly, the *M'Naghten* judges' answer to the first question clearly expresses the view that a person is punishable if that person "knew at the time of committing their crime that he was acting contrary to law."[11] Both the *Schmidt* court and the majority, however, relied on the answer to the second and third questions in *M'Naghten* to support their conclusion.

In *Schmidt*, the court stated that the "judges [in *M'Naghten*] *expressly* held that a defendant who knew nothing of the law would nonetheless be responsible if he knew that the act was wrong." *Schmidt*, 110 N.E. at 947 (emphasis added). From this premise, the *Schmidt* court concluded "by which, therefore, [the *M'Naghten* judges] must have meant, if you knew that it was morally wrong." *Id.* This conclusion is unsupported, however, because nowhere in the answer to the second and third questions do the *M'Naghten* judges "expressly" or impliedly hold what the *Schmidt* court states they hold.

Relying on the tenuous reasoning in *Schmidt*, the majority states that the *M'Naghten* judges' answer to the second and third questions "qualifies the reference to 'law of the land' in the first answer" and "suggests that a person may be considered legally sane as long as the person commits an act contrary to law and knows that the act was morally wrong without regard to the person's actual knowledge of its illegality under positive law."[12] The majority, and *Schmidt*, opinions' interpretation of the answer to the second and third questions, in my view, disregards the plain meaning of the *M'Naghten* answers.

The answer to the second and third questions does not "qualify" the first answer, as the majority states, but instead explains the first answer by stating how the jury should be instructed.[13] The best way to demonstrate this is with the aid of a hypothetical. A defendant is charged with murder and pleads insanity. In such a case, the *M'Naghten* judges state that the question of the defendant's sanity should not be put to the jury "generally and in the abstract." *M'Naghten*, 8 Eng.Rep. at 723. By this they meant that the jury should not be asked whether the defendant knew that *murder* was against the law. If the court submits the instruction "generally and in the abstract," the court would be asking the jury, on the one hand, whether the

himself concedes that he is sane, and that everything which he said to the contrary was a fraud upon the court." *Schmidt*, 110 N.E. at 950.

11. In *M'Naghten*, the House of Lords submitted five questions to the Queen's Bench asking the proper standard of legal insanity. The answers to the five questions have become the law of the case. *See generally* Wayne LaFave & Austin Scott, *Criminal Law* § 4.2 (2d ed. 1986).

12. The majority draws a distinction between society's morals and the positive law. I disagree with such a distinction. Our positive law is nothing more than society's morals as reflected through our majoritarian form of government. Accordingly, they are one and the same.

13. The relevant part of the answer to the second and third questions states:

The mode of putting the latter part of the question to the jury on these occasions has

generally been, whether the accused at the time of doing the act knew the difference between right and wrong: which mode, though rarely, if ever, leading to any mistake with the jury, *is not, as we conceive, so accurate when put generally and in the abstract, as when put with reference to the party's knowledge of right and wrong, in respect to the very act with which he is charged. If the question were to be put to the knowledge of the accused solely and exclusively with reference to the law of the land, it might tend to confound the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction; whereas the law is administered upon the principle that everyone must be taken conclusively to know it, without proof that he does know it.* If the accused was conscious that the act was one which he ought not to do, and if that act was at the same time contrary to the law of the land, he is punishable[.]
*M'Naghten*, 8 Eng.Rep. at 722–23.

defendant actually knew murder was against the law, while on the other hand, the defendant is presumed to know the law. Such a request would confuse the jury. *Id.*

To avoid such confusion, the judges stated that the question should be put to the jury "with reference to the party's knowledge of right and wrong, in respect to the very act with which he is charged." *Id.* By this they meant whether the defendant was "conscious" that the particular act he or she committed (whatever it is labeled by the state) was against the law.[14] Such an interpretation flows logically from a reading of the answer to the second and third questions and complements, instead of conflicts with, the answer to the first question.[15]

Section 16–8–101(1) is a codification of the *M'Naghten* right from wrong test. *People v. Low*, 732 P.2d 622, 629 n. 9 (Colo.1987); *Castro v. People*, 140 Colo. 493, 346 P.2d 1020 (1959). The *M'Naghten* rule looks exclusively to the cognitive capacity of the accused, *United States v. Freeman*, 357 F.2d 606, 624 (2d Cir.1966), and contemplates as insane a person "who is totally devoid of cognitive ... capacity." *Wade v. United States*, 426 F.2d 64 (9th Cir.1970). Under *M'Naghten*, even though the defendant committed the act under a delusion, "he is nevertheless punishable ... if he knew at the time of committing such crime that he was acting contrary to ... the law of the land." *M'Naghten's Case*, 8 Eng.Rep. at 722 (1843); *see also State v. Boan*, 235 Kan. 800, 686 P.2d 160, 168 (1984).

We should not leave to the jury the question of whether some particular act is morally right or wrong.

> Only a part of a society's moral standards becomes so fixed and agreed upon as to become law. Until a moral standard becomes law it is an unreliable test for insanity. We believe it is far more

workable and a more accurate measure of mental health to test a defendant's ability to understand what society has fixed and established as law.

*State v. Hamann*, 285 N.W.2d 180, 184 (Iowa 1979). During hearings on H.B. 1289, which amended the definition of insanity in 1983, the bill's sponsor stated: "As far as testifying to the ultimate question of sanity or insanity, you have a legal issue, sanity and insanity are legal terms and I believe they should stay in the realm of legality and not in the realm of medical science." *Hearings on H.B. 1289 Before the House Judiciary Committee*, 54th Gen. Assembly, 1st Reg. Sess. (Audio Tape 83–8, Feb. 15, 1983, at 2:15 p.m.). This court should follow the intent of the General Assembly, and the plain meaning of *M'Naghten*, and conclude that the General Assembly adopted a legal standard for determining criminal insanity in section 16–8–101(1).

## II.

I also disagree with the majority's decision concerning the deific decree exception recognized by the court of appeals. The deific decree exception is a narrow exception recognized by a small minority of those states which define wrong by society's moral standards. *State v. Crenshaw*, 659 P.2d 488, 494 (Wash.1983). This exception has been applied in cases where a defendant knew an act was legally wrong but believed, because of a mental defect, that God decreed the act. *Id.* A person qualifies as insane under this exception only if their free will has been overcome by their belief in the deific decree. *State v. Rice*, 110 Wash.2d 577, 757 P.2d 889, 904 (1988).

The majority states, however, that the deific decree exception "is not so much an exception to the right from wrong test measured by existing societal standards of

**14.** Thus, if a defendant knows that stabbing his wife is against the law, he is conscious that the act was one he ought not to do.

**15.** Moreover, in England, the *M'Naghten* test has been interpreted as meaning "contrary to law" and not according "to the opinion of one man

or a number of people on the question whether a particular act might or might not be justified." *Regina v. Windle*, 2 Q.B. 826 (1952) (rejecting the argument that under the *M'Naghten* test the phrase "right and wrong" should be taken in the moral rather than legal sense).

morality as it is an integral factor in assessing a person's cognitive ability." Maj op. at 139. The majority then holds that a defendant may be adjudged insane when the defendant's cognitive ability to distinguish right from wrong has been destroyed as a result of a psychotic delusion that God has decreed the act. Maj. op. at 140. By limiting the type of delusion that might constitute insanity to a "delusion that God commanded the act," however, the majority goes beyond the scope of the *M'Naghten* test in section 16–8–101(1) and consequently creates an exception by incorporating a subjective standard—a person's religious inclinations and beliefs—into section 16–8–101(1).

In Colorado, neither the General Assembly nor this court has accepted subjective tests to determine criminal responsibility. In the 1983 revision of section 16–8–101, the legislature deleted the volitional prong of the insanity definition. *See* Ch. 188, sec. 1, § 16–8–101, 1983 Colo.Sess.Laws 672; *Hearings on H.B. 1289 Before the House Judiciary Committee*, 54th Gen. Assembly, 1st Reg. Sess. (Audio Tape 83–8, Feb. 15, 1983, at 2:15 p.m.). By deleting the volitional prong, the legislature eliminated any focus on an individual's subjective behavior and restricted the insanity defense only to those cases where the defendant was incapable of distinguishing right from wrong. *See* Sarah Sammons, *Legislative Update*, 12 Colo.Law. 1251, 1252 (1983).

Similarly, this court has refused to adopt subjective standards for determining criminal responsibility. In *Castro v. People*, 140 Colo. 493, 346 P.2d 1020 (1959), the defendant claimed that he was deprived of due process and equal protection of the laws because the insanity statute was so at variance with scientific fact that it was impracticable and unworkable. The court stated the defendant's position as follows:

> [T]he test should be the accused's ability to emotionally and intellectually realize and appreciate, as an integrated personality, the nature and consequences of the moral choice presented, and that the mere ability to verbalize a correct answer to questions about the distinction should

not be accepted as conclusive on the issue of criminal responsibility.

*Id.* at 507–08, 346 P.2d at 1028 (quoting Annotation, *Modern Status of the M'Naghten "Right–and–Wrong" Test of Criminal Responsibility*, 45 A.L.R.2d 1447, 1450 (1956)). The court concluded that the statute had adopted the *M'Naghten* right from wrong test and refused to follow the defendant's position that a subjective standard should be used to determine criminal responsibility. *Id.* at 507–09, 346 P.2d at 1027–28.

Thus, the General Assembly has rejected a subjective standard for measuring a defendant's behavior, while this court has rejected a subjective standard for determining whether a defendant is criminally responsible. The focus under *M'Naghten*, and section 16–8–101(1), should be whether the defendant's mental status prevented the defendant from being "conscious" that his or her conduct was forbidden by the law. Accordingly, under the current statute, I would reject the subjective deific decree exception, either in the form adopted by the court of appeals or in the form adopted by the majority.

### III.

I also disagree with the majority's conclusion "that a retrial of the defendant would violate the federal and state constitutional prohibitions against placing an accused twice in jeopardy for the same offense. U.S. Const. amend. V; Colo. Const. art. II, § 18." Maj. op. at 140. I disagree because, under the bifurcated trial system, a defendant is not placed in jeopardy during the sanity phase of the trial.

"The constitutional prohibition against double jeopardy means that no person shall twice be put in danger of conviction and punishment for the same offense." *People v. King*, 181 Colo. 439, 444, 510 P.2d 333, 336 (1973). Jeopardy does not attach until "the defendant is present at a judicial proceeding aimed at reaching a final determination of his guilt or innocence." *People v. Paulsen*, 198 Colo. 458, 460, 601 P.2d 634, 636 (1979). "Without a risk of a determination of guilt, jeopardy does not attach, and

neither an appeal nor further prosecution constitutes double jeopardy." *Serfass v. United States*, 420 U.S. 377, 391–92, 95 S.Ct. 1055, 1064–65, 43 L.Ed.2d 265 (1974); *see also State v. Rodriguez*, 67 Haw. 70, 679 P.2d 615, 622 (1984) (Relying on *Serfass*, the court states that "[d]ouble jeopardy does not attach unless there is a risk of a determination of guilt."), *cert. denied*, 469 U.S. 1078, 105 S.Ct. 580, 83 L.Ed.2d 691 (1984). Under the bifurcated trial system, the defendant does not face a conviction or "a risk of a determination of guilt" during the sanity phase of the trial. Thus, jeopardy does not attach.

### A.

The majority, however, relying on *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), overrules *People v. King*, 181 Colo. 439, 444, 510 P.2d 333, 336 (1973), in which this court reversed the trial court's direction of an insanity verdict and held that a retrial of the defendant would not violate the double jeopardy clauses of the federal and state constitutions.

In *Burks*, the defendant was charged with robbing a bank, and raised the insanity defense. In a non-bifurcated trial, the case was submitted to the jury to determine whether the defendant was guilty, not guilty, or not guilty by reason of insanity. The jury returned a verdict of guilty. The defendant appealed the conviction, claiming that the evidence was insufficient to prove he was sane beyond a reasonable doubt. The Sixth Circuit agreed with the defendant and reversed defendant's conviction. The court then remanded the case "for a determination of whether a directed verdict of acquittal should be entered or a new trial ordered." *Id.* 437 U.S. at 4, 98 S.Ct. at 2143.

The United States Supreme Court granted certiorari to determine "whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury." *Id.* The Court held that "the double jeopardy clause precludes a second trial once the reviewing court has found the evidence legally insufficient."

I disagree with the majority's reliance on *Burks* for two reasons. First, *Burks* was a non-bifurcated trial in which the jury had to decide between a verdict of guilty, not guilty, or not guilty by reason of insanity. The defendant in *Burks* faced possible conviction for his crimes, and thus, under federal and state double jeopardy principles, jeopardy attached.

Under the bifurcated trial system, however, the defendant is not subjected to the possibility of conviction for the crime charged during the sanity trial. *See* § 16–8–105, 8A C.R.S. (1986). "The sanity trial is designed to determine whether the defendant was *sane* or *insane* at the time of the alleged offense, and the issue of *guilt* or *innocence* plays no part in the resolution of this issue." *People v. Morgan*, 637 P.2d 338, 341 (Colo.1981) (emphasis added). Thus, a defendant is not placed in jeopardy during the sanity phase of the trial, and jeopardy does not attach.

Second, the majority concludes that

[b]ecause *Burks* holds that an appellate determination of evidentiary insufficiency to sustain a verdict is an adjudication on the merits that bars retrial, it necessarily follows that the Double Jeopardy Clause of the United States Constitution prohibits retrial after a jury verdict of not guilty by reason of insanity. Such a verdict represents a judicial determination that, irrespective of any error in a trial court's instructional rulings, the prosecution has failed to prove the defendant's sanity beyond a reasonable doubt and that, consequently, the defendant lacked the mental capacity to commit the crime charged against him.

Maj. op. at 141. However, the fact that the prosecution failed to prove the defendant's sanity does not mean that "the defendant lacked the mental capacity to commit the crime charged against him." A not-guilty-by-reason-of-insanity verdict does not address the elements of the crime charged. Insanity "addresses the issue of whether the defendant has sufficient mental capacity *to be held accountable* for any crimes he may have committed. It does *not* answer the question of whether the defen-

dant was capable of forming a particular mental state required for a conviction of the substantive charge. This determination is left for another jury, pursuant to section 16–8–104, C.R.S.1973 (1978 Repl. Vol. 8)." *People v. Morgan,* 637 P.2d 338, 342 (Colo.1981) (emphasis added); *see also* § 16–8–101(1) (person "incapable of distinguishing right from wrong with respect to that act *is not accountable* "); § 18–1–802, 8B C.R.S. (1986) ("A person who is insane, as defined in section 16–8–101, C.R.S., is not responsible for his conduct defined as criminal.").

The jury in a sanity trial is only asked to determine whether the defendant is sane or insane, and not whether the defendant lacked the requisite culpable mental state to commit the crime. *See Morgan,* 637 P.2d at 341–42. Thus, under our statute and procedures, a not-guilty-by-reason-of-insanity verdict is not an adjudication on the merits, as the majority contends.

In this case, the sanity trial was not aimed at reaching a final determination of the defendant's guilt or innocence, and was not the equivalent of an adjudication on the merits. Accordingly, the sanity trial does not preclude the retrial of the defendant.

I would reverse the court of appeals and district court, and remand the case for a new sanity trial.