23CA0395 Peo v Gonzalez 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0395
Arapahoe County District Court No. 20CR1811
Honorable Ryan J. Stuart, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Julio Cesar Gonzalez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Grove and Taubman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kelly A. Corcoran, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Julio Cesar Gonzalez appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree assault, second degree assault, and felony menacing.  He argues that the district court erred by (1) admitting sanity evidence during the prosecution's case-in-chief; (2) improperly instructing the jury on his insanity defense; and (3) allowing the prosecutor to make improper statements during closing argument.  Additionally, Gonzalez argues that the cumulative effect of these errors requires reversal.  We disagree with these contentions and affirm the conviction.

I.    Background

¶ 2    Gonzalez struggled with his mental health for years.  He began exhibiting symptoms of schizophrenia as a teenager and became homeless at the age of eighteen.  By 2019, his mental health had worsened.  He was hospitalized twice, and on both occasions, his treating psychiatrists diagnosed him with schizophrenia.

¶ 3    In July 2020, Gonzalez committed two separate assaults against women along a public trail near the campsite where he had been living.  In the first attack, at midday on July 8, Gonzalez struck a woman on the arm with a piece of wood.  The woman had

1

been biking behind her two daughters and, after the assault, continued down the path to call the police.

¶ 4     In the second attack, early in the morning on July 11, Gonzalez attacked a woman walking with her female friend. From a distance, both women saw Gonzalez striking the ground with a wooden board. As they approached, they greeted him. Gonzalez asked why they were bothering him and demanded they leave him alone. Then, without hesitating, he ran toward one woman and struck her repeatedly with the board. The attack left the woman with a split scalp, a bruised back, a brain bleed, temporary hearing loss, and a broken finger with exposed bone.

¶ 5     The prosecution charged Gonzalez with (1) second degree assault for the July 8 attack; and (2) attempted first degree murder, first degree assault, and felony menacing for the July 11 attack. At his arraignment, Gonzalez entered a plea of not guilty by reason of insanity (NGRI) and formally notified both the district court and the prosecution of his intention to present testimony regarding his mental condition. After providing the required advisement and receiving Gonzalez's waiver of privilege, the court ordered the

required sanity examination. A state hospital forensic psychologist completed the court-ordered examination.

¶ 6 At trial, during its case-in-chief, the prosecution called the forensic psychologist, who testified that Gonzalez suffered from schizophrenia and auditory hallucinations. She clarified that this diagnosis does not automatically make someone "legally insane," as a person with schizophrenia and auditory hallucinations may still distinguish right from wrong and form the required mental state to commit a crime.

¶ 7 The psychologist testified that, during both assaults, Gonzalez was experiencing symptoms of schizophrenia, including auditory hallucinations where he heard voices saying insulting things about him, which made him angry. However, she also agreed that anger is not a "diagnostic symptom" of schizophrenia and that Gonzalez told her he attacked the women because he was angry.

¶ 8 The psychologist ultimately concluded that Gonzalez was sane when the assaults occurred. She opined that he was able to distinguish right from wrong, he knew both before and after the assaults that he could get into trouble for committing them, and he

refrained from attacking other individuals because he recognized such behavior as wrong.

¶ 9    Gonzalez supported his insanity defense with (1) several video recordings of his interactions with police officers on July 8 and July 11; (2) testimony from his sister; and (3) testimony from three psychiatrists.  The psychiatrists provided the following testimony:

- Dr. Jacqueline Henschke, the psychiatrist who treated Gonzalez during his first hospitalization in 2019, testified that she would now diagnose him with paranoid schizophrenia.  She noted that research suggests people with paranoid schizophrenia are more likely to display violent behavior than those with other mental illnesses, although violence itself is not a symptom of schizophrenia.  She did not determine Gonzalez's mental state at the time of the assaults.

- Dr. Roderick O'Brien, the neuropsychiatrist who treated Gonzalez during his second hospitalization in 2019, testified that he diagnosed Gonzalez with chronic paranoid schizophrenia.  He explained that people experiencing psychotic symptoms from schizophrenia

often have difficulty distinguishing between what is real and what is not and understanding the consequences of their actions. He added that paranoid schizophrenia can sometimes lead to violent behavior as a reaction to these symptoms, although violence itself is not a diagnostic criterion for schizophrenia. He did not offer an opinion on Gonzalez's mental state at the time of the assaults.

- Dr. Ahmad Adi, a forensic psychiatry expert who evaluated Gonzalez in July 2021, diagnosed him with schizophrenia and cannabis use disorder. He concluded that Gonzalez suffered from a mental disease or defect at the time of both assaults, identifying his psychotic symptoms from schizophrenia as the decisive factor in each incident; Dr. Adi opined that neither assault would have occurred absent these symptoms. However, Dr. Adi did not conduct a formal sanity evaluation to determine Gonzalez's legal insanity at the time of the offenses.

¶ 10    Ultimately, the jury rejected Gonzalez's NGRI defense. It acquitted him of attempted first degree murder but convicted him of first degree assault, second degree assault, and felony menacing.

¶ 11    Gonzalez now appeals.

## II.    Prosecution's Case-in-Chief Evidence

¶ 12    Gonzalez argues that the district court erred by admitting the psychologist's testimony about the court-ordered examination during the prosecution's case-in-chief. Specifically, he argues that the defense had to present insanity evidence before the prosecution could introduce the psychologist's testimony and that Gonzalez's plea of NGRI did not constitute such evidence. We disagree.

### A.    Additional Facts

¶ 13    In a pretrial motion, Gonzalez asked the court to prohibit the introduction of evidence from his court-ordered examination during the prosecution's case-in-chief. He asserted the prosecution could admit information from the court-ordered examination only as "rebuttal evidence" under section 16-8-107(1)(a), C.R.S. 2025.

¶ 14    At the outset of trial, the court stated that it would "grant the motion preventing the [prosecution] from introducing any sanity evidence until there's been some evidence presented by the defense related to mental condition or insanity," but it later clarified that it was "willing to reconsider" the ruling if the prosecution presented

6

contrary authority. Defense counsel subsequently reserved his opening statement until after the prosecution's case-in-chief.

¶ 15    During jury selection, the court — with the parties' agreement — informed the jury that Gonzalez had pleaded NGRI and that it would be tasked with "decid[ing] whether the prosecution ha[d] proven beyond a reasonable doubt . . . [Gonzalez's] guilt and sanity." Without objection, the court also instructed the jury on the law governing the insanity defense. Both the prosecutor and defense counsel thoroughly discussed the insanity defense with prospective jurors during voir dire, addressing the distinction between mental illness and insanity, the prosecution's burden of proof, and the jurors' ability to follow the court's instruction on the insanity defense.

¶ 16    On the fourth day of trial, the court reconsidered its previous ruling. The court noted that section 16-8-107(1.5)(a), unlike section 16-8-107(1)(a), does not limit the prosecution to presenting sanity testimony solely as "rebuttal evidence." Accordingly, "based upon [Gonzalez's] plea of [NGRI]," the court allowed the prosecution to introduce the testimony of the psychologist who conducted Gonzalez's court-ordered examination during its case-in-chief.

¶ 17    Before the psychologist took the stand, the court instructed the jury that it could consider her testimony only to determine "whether the prosecution ha[d] proven beyond a reasonable doubt that [Gonzalez] was sane at the time of the offenses" and "whether the prosecution ha[d] proven beyond a reasonable doubt the culpable mental state for each offense."  The court provided similar guidance in its written jury instructions.

## B.    Standard of Review

¶ 18    Two standards of review govern our analysis.  First, we review questions of law involving statutory construction de novo.  *People v. Moore*, 2021 CO 26, ¶ 25.  When interpreting a statute, we begin with its language, giving words and phrases their plain and ordinary meanings.  *Id.*  We also consider the statute as a whole, construing each provision consistently and in harmony with the overall statutory design.  *Id.*  If the statute is clear, we rely solely on its plain language to determine its meaning.  *Id.*

¶ 19    Second, we review evidentiary rulings for an abuse of discretion.  *Id.* at ¶ 26.  Under CRE 611(a), a district court has broad discretion to control the order of interrogating witnesses and presenting evidence.  *People v. Walden*, 224 P.3d 369, 376 (Colo.

8

App. 2009) ("The order of proof at trial is a matter within the trial court's sound discretion, and courts are given wide latitude in deciding these matters."). A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *People v. Johnson*, 2021 CO 35, ¶ 16.

¶ 20     We review preserved evidentiary errors under the nonconstitutional harmless error standard.[1] *Davis v. People*, 2013 CO 57, ¶ 13. "Therefore, if we find an abuse of discretion, then we . . . consider whether any error, in light of the entire record of the trial, substantially influenced the verdict or impaired the fairness of the trial." *Id.*

C.     Analysis

¶ 21     We disagree that the court erred by admitting evidence from the court-ordered sanity examination during the prosecution's case-in-chief for several reasons.

---

[1] Gonzalez contends this error is one of constitutional dimension because it implicates his right to counsel. But he fails to develop this argument. *See People v. Cuellar*, 2023 COA 20, ¶ 44 (noting that we do not address undeveloped arguments). Moreover, we fail to see how the order of proof at trial directly implicates the right to counsel. *See Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010) ("[O]nly errors that specifically and directly offend a defendant's constitutional rights are 'constitutional' in nature.").

## 1. Abuse of Discretion

¶ 22    Gonzalez argues that the court abused its discretion by misapplying the law. Specifically, he asserts the court misapplied both case law and statute by allowing the prosecution to present the psychologist's testimony during its case-in-chief.

¶ 23    First, Gonzalez relies on *People v. Hill*, 934 P.2d 821, 827 (Colo. 1997), to argue that his NGRI plea alone does not raise the issue of insanity for the jury. He notes that "the evidence at trial, not the defendant's NGRI plea, determines whether sanity is an issue for the jury." Accordingly, Gonzalez argues that the court erred by allowing the prosecution to introduce the psychologist's testimony before he introduced evidence of insanity.

¶ 24    Gonzalez's interpretation stretches *Hill* beyond its holding. In *Hill*, the supreme court addressed a narrow issue: "Whether a defendant is entitled to have the question of his sanity determined by a jury where he has presented no evidence of insanity sufficient to overcome the presumption of sanity." *Id.* at 824. The court held that a defendant who pleaded NGRI was not entitled to a jury instruction on insanity without presenting "some credible evidence" to overcome the statutory presumption of sanity. *Id.* at 826-27.

The *Hill* decision did not address what evidence the prosecution may introduce during its case-in-chief.

¶ 25     Second, Gonzalez argues that the court misapplied section 16-8-107, which governs the admissibility of evidence acquired, directly or indirectly, for the first time during a court-ordered examination.  Section 16-8-107(1)(a) makes such evidence inadmissible "against the defendant on the issues raised by a plea of *not guilty*, . . . except to rebut evidence of the defendant's mental condition introduced by the defendant to show incapacity to form a culpable mental state."  *Id.* (emphasis added).  In contrast, section 16-8-107(1.5)(a) states that this type of evidence is "admissible only as to the issues raised by the defendant's plea of [NGRI], and the jury, at the request of either party, must be so instructed."  *Id.* Importantly, unlike subsection (1)(a), subsection (1.5)(a) does not limit the evidence to rebuttal presentation only.

¶ 26     Gonzalez relies on subsection (1)(a) to argue that evidence from a court-ordered examination is admissible by the prosecution only as rebuttal evidence.  Gonzalez's reliance is misplaced. Subsection (1)(a) prohibits the prosecution from introducing such evidence "on the issues raised by a plea of not guilty" except to

rebut the defendant's evidence regarding his mental condition. In this case, however, the psychologist's testimony was not introduced to address issues raised by a not guilty plea; instead, it was offered solely on the issues raised by the NGRI plea. The psychologist testified only as to whether Gonzalez met the statutory criteria for insanity. Thus, under subsection (1.5)(a), evidence from a court-ordered examination is admissible without any requirement that it be presented in rebuttal.

¶ 27 Gonzalez argues that the restriction found in subsection (1)(a) should be incorporated into subsection (1.5)(a) because an "NGRI plea includes a plea of not guilty." However, "when the legislature includes a provision in one statute, but omits that provision from another similar statute, the omission is evidence of its intent." *Deutsch v. Kalcevic*, 140 P.3d 340, 342 (Colo. App. 2006). Accordingly, we conclude that the General Assembly did not intend to limit the use of evidence from the court-ordered examination to rebuttal evidence when a defendant pleads NGRI.

¶ 28 Finally, consistent with CRE 611(a), the district court properly exercised its broad discretion by permitting the psychologist to testify during the prosecution's case-in-chief. Typically, the

12

prosecution does not offer sanity evidence until rebuttal.  *See Castro v. People*, 346 P.2d 1020, 1027 (Colo. 1959) ("Ordinarily the issue of insanity is not present at the outset of the trial and is not properly a part of the prosecution's case."); *People v. Jones*, 390 N.W.2d 189, 191 (Mich. Ct. App. 1986) ("Normally, [sanity] evidence is presented by the prosecution in rebuttal since no proof of sanity is presented in the case in chief due to the presumption.").

¶ 29     In this case, however, the district court — with the parties' agreement — instructed prospective jurors that Gonzalez had pleaded NGRI, meaning that they would need to determine whether his mental state relieved him of legal responsibility for the offenses charged.  And the parties' discussion during jury selection underscored that Gonzalez's insanity defense was a central issue at trial.  *Cf. Brown v. State*, 686 So. 2d 385, 408 (Ala. Crim. App. 1995) (holding that "the State, in anticipation of the appellant's insanity defense, had a right to produce evidence rebutting the appellant's defense" in its case-in-chief when defense counsel told the jury during opening statements that the appellant had pleaded NGRI and intended to present expert testimony), *aff'd sub nom., Ex Parte Brown*, 686 So. 2d 409 (Ala. 1996); *see also* 14 Robert J.

Dieter, *Colorado Practice Series, Criminal Practice and Procedure* § 5.36, Westlaw (2d ed. database updated Oct. 2025) ("[A]s a practical matter and in recognition of the slight proof required to refute the presumption of sanity, the prosecution will present evidence of sanity in its case in chief.").

¶ 30    Because the jury selection discussions established that Gonzalez's insanity defense was a central issue — and the prosecution ultimately bore the burden of proving sanity beyond a reasonable doubt — the district court did not abuse its discretion by allowing the psychologist's testimony during the prosecution's case-in-chief. *See Walden*, 224 P.3d at 376; *Martinez v. People*, 493 P.2d 1350, 1352 (Colo. 1972) ("It is fundamental that the order of proof and presentation of witnesses is within the sound discretion of the trial court and error may not be predicated thereon in the absence of a showing of prejudice.").

### 2.    Harmless Error

¶ 31    Even if the court abused its discretion by permitting the prosecution to introduce sanity evidence during its case-in-chief, any error was harmless.  The jury would have heard the same evidence regardless of the sequence in which it was presented.

14

¶ 32    Gonzalez argues that the ruling was not harmless because it forced the defense to "deliver its opening statement after the sanity evidence was admitted," "respond as if its defense involved both tests for insanity," and "focus its presentation on insanity instead of challenging the prosecution's failure to prove [Gonzalez's] mental state."  We are not persuaded.

¶ 33    As for the timing of defense counsel's opening statement, he chose to reserve his statement even though he knew that the prosecution disputed the court's tentative ruling and that the court had clarified it was "willing to reconsider" it.  Further, we are unclear, and Gonzalez does not explain, how defense counsel's decision to reserve his opening statement until after the prosecution's case-in-chief substantially affected the outcome of the case.

¶ 34    We are likewise unpersuaded by Gonzalez's contention that he was forced to respond "as if [his] defense involved both tests for insanity" — that is, whether he was so diseased or defective in mind as to be unable to distinguish right from wrong and whether he suffered from a condition of mind that prevented him from forming the required mental state.  *See* 16-8-101.5(1), C.R.S. 2025.  At voir

15

dire, before opening statements, the court instructed the potential jurors regarding both insanity standards. Gonzalez neither objected to this instruction at trial nor raised it on appeal. Thus, Gonzalez was on notice that both insanity tests would be at issue before the prosecution's case-in-chief.

¶ 35    As for the claim that the defense was forced to shift focus, Gonzalez fails to explain how the introduction of the psychologist's testimony during the prosecution's case-in-chief impaired his ability to challenge the prosecution's proof of his mental state. Rather, defense counsel was able to present a robust defense on Gonzalez's behalf. The defense introduced testimony from three psychiatrists — the two treating psychiatrists from Gonzalez's 2019 hospitalizations and a psychiatrist retained for trial — as well as video evidence of Gonzalez's interactions with police officers and testimony from Gonzalez's sister to establish his insanity defense. Regardless of whether the psychologist testified during the prosecution's case-in-chief or on rebuttal, the jury would have heard the same evidence.

¶ 36    Accordingly, even if the district court erred in its ruling, the error was harmless.

## III. Jury Instructions

¶ 37　Gonzalez contends the district court improperly instructed the jury on his insanity defense.  He specifically argues that the court erred by rejecting three of his proposed changes to the instructions.  We disagree.

### A. Additional Facts

¶ 38　At the conclusion of the evidence, the district court instructed the jury on the insanity defense:

> The defendant was insane at the time of the commission of the acts if:
>
> 1. he was so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act; or
>
> 2. he suffered from a condition of mind caused by a mental disease or defect that prevented him from forming a culpable mental state that is an essential element of a crime charged.
>
> But care should be taken not to confuse mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions because, when an act is induced by any of these causes, the person is accountable to the law.

17

This instruction tracked the language in the model jury instructions. *See* COLJI-Crim. F:183 (2025); COLJI-Crim. I:01 (2025).

¶ 39    Gonzalez objected to the instruction and proposed the following changes: (1) removing the last sentence; (2) adding his theory on temporary insanity; and (3) adding a clarification on "anger that is the result of a mental disease or defect." The court denied his proposed changes.

### B.    Applicable Law and Standard of Review

¶ 40    The district court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support them. *Castillo v. People*, 2018 CO 62, ¶ 34. If there is sufficient evidence to warrant an instruction, the resulting "jury instruction should substantially track the language of the statute." *People v. Schnorenberg*, 2025 CO 43, ¶ 60 (citation omitted). As relevant here, section 16-8-101.5(1) provides the "applicable test of insanity":

> (a) A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable; except that care should be taken

18

not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions, for, when the act is induced by any of these causes, the person is accountable to the law; or

(b) A person who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged, but care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives and kindred evil conditions because, when the act is induced by any of these causes, the person is accountable to the law.

¶ 41    We review de novo whether jury instructions accurately inform the jury of the governing law and are supported by sufficient evidence.  *Garcia v. People*, 2022 CO 6, ¶ 15; *Castillo*, ¶ 32.  If the jury instructions accurately inform the jury of the law, "we review a [district] court's decision to give a particular jury instruction for an abuse of discretion."  *McDonald v. People*, 2021 CO 64, ¶ 54 (citation omitted).  Under this standard, the court has broad discretion in formulating the instructions and deciding whether additional instructions are required.  *Id.*  We may not disturb the

19

district court's ruling unless it is manifestly arbitrary, unreasonable, or unfair. *Id.*

## C. Analysis

¶ 42 We conclude that the district court's instruction adequately informed the jury of the law on insanity and was supported by the evidence, and the court did not abuse its discretion by rejecting Gonzalez's proposed changes.

### 1. Last Sentence of the Instruction

¶ 43 Gonzalez argues that the court should have removed the last sentence — concerning "moral obliquity" — from the jury instruction. He argues that its inclusion (1) obfuscated the law with "superfluous" and "not definitional" language; (2) improperly limited his insanity defense; and (3) was unsupported by the evidence. We address each of these points in turn.

¶ 44 Gonzalez maintains that this sentence obscures the law on insanity because the supreme court stated in *People v. Serravo*, 823 P.2d 128, 137 (Colo. 1992), that it was not "a definitional

component."[2]  But in *Serravo*, the court explained that the language's "purpose" was to clarify the definition of legal insanity. *Id.*  It distinguishes between (1) "an act resulting from legal insanity" — "an act committed by a person in a state of mental illness that renders the person incapable of distinguishing right from wrong with respect to the act" — and (2) "an act resulting from *moral* obliquity" — "an act committed by a person capable of distinguishing right from wrong but nonetheless acting out of a perverse and culpable rejection of prevailing moral standards."  *Id.*

¶ 45    Further, removing the last sentence would contravene the legislative intent to limit the insanity defense.  The General Assembly may constitutionally define criminal conduct, establish the legal components of criminal liability, and delineate statutory defenses.  *Copeland v. People*, 2 P.3d 1283, 1286 (Colo. 2000).  As written, the court's instruction "substantially track[ed]" the language of section 16-8-101.5(1) — as it should.  *Schnorenberg*, ¶ 60 (citation omitted); *see also People v. Carey*, 198 P.3d 1223,

---

[2] The 1986 version of the insanity statute, discussed in *People v. Serravo*, 823 P.2d 128, 133 (Colo. 1992), contains almost identical language on "moral obliquity" as the current version of the insanity statute.  *See* § 16-8-107(1), C.R.S. 2025.

1233 (Colo. App. 2008) ("[J]ury instructions phrased in the language of the applicable statute are generally sufficient."). The only difference is that the court included the "moral obliquity" sentence once at the end, while the statute includes it twice — after each test for insanity under subsections (1)(a) and (1)(b). § 16-8-101.5(1)(a)-(b). This statutory language was intended to limit the insanity defense by making it clear that acts caused by legal insanity should not be conflated with acts resulting from moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives. Accepting Gonzalez's proposed deletion would erase this distinction and improperly render the statute's "words or phrases superfluous." *Garcia*, ¶ 17 (citation omitted); *see also People v. Montgomery*, 669 P.2d 1387, 1389 (Colo. 1983) ("[C]ourts cannot, under the pretense of deciding a case, assume or usurp power vested in . . . the legislative" branch.).

¶ 46    Finally, the inclusion of this sentence was supported by the record since the evidence at trial raised the issue of whether Gonzalez's actions stemmed from his schizophrenia or from a generalized anger toward others. *See Castillo*, ¶ 34. The psychologist testified that anger is not a symptom of schizophrenia

22

and that Gonzalez could distinguish right from wrong and form the requisite mental state of the charged offenses when they occurred. Gonzalez told the psychologist that he was angry when the assaults occurred and that this anger was the reason he attacked the victims. It was for the jury to decide whether his actions resulted from anger or from a mental illness that rendered him incapable of distinguishing right from wrong or forming the requisite mental state of the charged offenses.

¶ 47    Accordingly, we conclude that the district court accurately instructed the jury on the insanity defense.

2.    Tendered Instruction on Temporary Insanity

¶ 48    Gonzalez argues the court should have included his proposed instruction on temporary insanity:

> [Gonzalez] need only be insane at the time of the commission of the acts. The insanity may be temporary in nature. A person who suffers from insanity at the time of the alleged crime, but later regains their sanity, is still insane under Colorado law.

However, the court did not abuse its discretion by declining to add this instruction.

¶ 49    In *People v. Voth*, 2013 CO 61, ¶ 38, the supreme court held "that section 16-8-101.5 contemplates *both* temporary and long-term insanity based on the statute's plain language." Similarly, in this case, the district court found, and we agree, that the substance of Gonzalez's proposed instruction was already included in the court's instruction. Indeed, the district court's instruction repeated the statute's phrase, "at the time of the commission of the act[s]," five times. § 16-8-101.5. This instruction made clear that the only relevant issue for the jury was whether Gonzalez was insane at the time of the charged offenses.

### 3.    Tendered Instruction on Anger

¶ 50    Gonzalez argues that the court should have added an instruction explaining that

> [a]nger as a result of a mental disease or defect is not the same as anger that is not based [on a] mental disease or defect. You should not confuse the two when considering the evidence. Anger that is the result of a mental disease or defect does not preclude a finding of insanity.

He contends that the "court had a duty to correct th[e] misimpression" caused by the prosecution's use of the "moral obliquity" sentence in closing argument.

24

¶ 51    However, the district court did not abuse its discretion by declining to give this additional instruction. As already explained, the court accurately instructed the jury on the law of insanity and highlighted the defense's theory — that "legal sanity is the predicate to legal accountability." Because the jury was properly instructed, the court retained "broad discretion" in deciding whether to supplement the instructions with Gonzalez's proposed instruction. *McDonald,* ¶ 54 (citation omitted).

¶ 52    Gonzalez maintains that the court had a duty to correct the misimpression he claims was created by the prosecutor's closing argument — specifically, the suggestion that an absence of emotion or motivation is required for legal accountability. But the prosecutor did not make such an assertion. Instead, the prosecutor acknowledged Gonzalez's mental illness but emphasized that mental illness is distinct from legal insanity; Gonzalez could be both mentally ill and angry, yet still legally sane. The court's refusal to give the requested instruction was not manifestly arbitrary, unreasonable, or unfair. *See id.*

¶ 53    In conclusion, the district court's instruction adequately informed the jury of the law on insanity and was supported by the

evidence, and the court did not abuse its discretion by rejecting Gonzalez's proposed changes to the jury instructions.

## IV. Prosecutorial Misconduct

¶ 54    Gonzalez contends the prosecutor committed misconduct during closing argument by "misus[ing] the [moral obliquity] sentence to generate confusion by focusing on anger and accountability." Specifically, he asserts that the prosecutor used this sentence to "to suggest that persons who are legally insane become accountable under the law in certain circumstances." We again disagree.

### A. Additional Facts

¶ 55    In his initial closing argument, the prosecutor outlined the "two parts" to the insanity test under Colorado law. *See* § 16-8-101.5(1)(a)-(b). He clarified that a person is not "automatically" legally insane simply because that person has a mental illness or suffers from symptoms of mental illness. He explained, rather, that Gonzalez can be "mad at the voices" in his head, "mad at the world," and still be legally accountable because, if he knows right from wrong and if he is able to act with intent, he is still legally sane. The prosecutor then stated:

26

All the doctors say he has schizophrenia, but that is not where the law stops. That is not where he is not accountable under the law. You have to go to the next step, and we'll talk about what the evidence is there.

The instruction tells you to make sure you take care not to confuse mental disease or defect with things like moral obliquity, moral depravity, passion growing out of anger, or revenge, hatred, or other motives and kindred evil condition, because a person is accountable under the law when they are acting from that.

You will hear a lot about anger. He talks a lot about anger, because he was angry that day. He was angry because the voices made him mad. The problem is he took that anger and he applied it to [the mother riding a bicycle]. He took that anger and he attacked [the woman walking]. That does not mean he is insane. . . .

And it doesn't mean he is not accountable for the law. He could be angry for all of those things and still be legally sane, because the definition is here about what sanity is. Not was it a factor. Not was it contributing. Those are not the definitions. That is not what sanity is in Colorado.

If you find [Gonzalez] not guilty on any of the counts, you're asked was it due solely to this issue of sanity.

Defense counsel objected to these statements, and the court overruled the objection.

27

### B. Applicable Law and Standard of Review

¶ 56    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* We consider the context of the argument as a whole and view it in light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30. Because arguments delivered in the heat of trial are not always perfectly scripted, we give the prosecutor the benefit of the doubt when his remarks are "ambiguous or simply inartful." *Id.*

¶ 57    Second, if we identify misconduct, then we determine whether it warrants reversal under the applicable standard of review. *Wend*, 235 P.3d at 1096. When, as here, the alleged misconduct is not of constitutional magnitude, we review preserved claims of prosecutorial misconduct for an abuse of discretion. *People v. Rhea*, 2014 COA 60, ¶ 42. Under this standard, the district court's rulings on prosecutorial misconduct "will not be disturbed by an appellate court in the absence of a gross abuse of discretion resulting in prejudice and a denial of justice." *Id.* (quoting *People v. Moody*, 676 P.2d 691, 697 (Colo.1984)).

## C. Analysis

¶ 58 Considering the prosecutor's argument as a whole, we conclude that no misconduct occurred. While the prosecutor conceded that Gonzalez struggled with mental illness, he ultimately argued that a legally sane person — including someone who suffers from mental illness but acts out of anger — is still accountable under the law.

¶ 59 Gonzalez appears to equate the prosecutor's acknowledgment of mental illness with a concession of legal insanity. He asserts that the prosecutor suggested "persons who are legally insane become accountable under the law in certain circumstances." If the prosecutor had made such a statement, it would have constituted misconduct because a prosecutor cannot misstate the law. *See Samson,* ¶ 32. But the record does not support Gonzalez's assertion.

¶ 60 The prosecutor never conceded that Gonzalez was legally insane. Rather, he explicitly distinguished mental illness from legal insanity. Based on the evidence, the prosecutor argued that, although Gonzalez suffered from a mental disease, it did not make him incapable of distinguishing right from wrong and forming the

requisite mental state. When Gonzalez attacked the victims, the prosecutor maintained, he acted out of passion growing out of anger. *See People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) ("A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts."), *overruled in part on other grounds by*, *People v. Kennedy*, 2025 CO 63.

¶ 61    Under these circumstances, we conclude that the district court did not abuse its discretion by overruling defense counsel's objection to the prosecutor's remarks in his closing argument.

## V.    Cumulative Error

¶ 62    Finally, Gonzalez contends that the cumulative effect of these alleged errors requires reversal. We are not persuaded.

¶ 63    "The doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *People v. Conyac*, 2014 COA 8M, ¶ 152. Under this doctrine, while an error may be harmless in isolation, reversal is required when the cumulative effect of multiple errors or defects substantially affects the fairness of the trial or undermines the integrity of the factfinding process. *Howard-Walker v. People*, 2019 CO 69, ¶ 24.

¶ 64    Because we have not identified multiple errors, but merely assumed one possible error, there can be no cumulative error. *See People v. Thames*, 2019 COA 124, ¶ 69 ("Even assuming that the trial court erred once, a single error is insufficient to reverse under the cumulative error standard.").

## VI.   Disposition

¶ 65    The judgment is affirmed.

JUDGE GROVE and JUDGE TAUBMAN concur.